Exhibit "D"

R. Rex Parris Esq. (SBN 96567)
rrparris@rrexparris.com
Alexander R. Wheeler, Esq. (SBN 239541)
awheeler@rrexparris.com
Patricia K. Oliver, Esq. (SBN 193423)
poliver@rrexparris.com
**R. REX PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Telephone:     (661) 949-2595
Facsimile:     (661) 949-7524

Deborah A. Klar, Esq. (SBN 124750)
dklar@dklarlaw.com
2934 ½ Beverly Glen Circle
Bel Air, California 90077
Telephone:     (310) 858-9500

Attorneys for Claimant
DAVID COUCH

# FINRA DISPUTE RESOLUTION, INC.

| | |
|---|---|
| DAVID COUCH,<br><br>  Claimant,<br><br>  v.<br><br>MORGAN STANLEY & CO. and MORGAN STANLEY SMITH BARNEY, LLC<br><br>  Respondents. | CASE NO.:<br><br>CLAIM IN ARBITRATION |

Claimant David Couch allege as follows:

## THE PARTIES

1.     Claimant David Couch ("Couch or "Claimant") is a former employee of Morgan Stanley & Co., Incorporated and Respondent Morgan Stanley Smith Barney, LLC (collectively "Morgan Stanley"), resident in the Morgan Stanley Office located at 9100 Ming Avenue, Suite 205 Bakersfield, CA 93311.

2.      Respondent Morgan Stanley & Co., Incorporated ("MS&Co."), at all times material hereto, was a Delaware limited liability corporation, registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC") and with the State of California.  MS&Co. is not licensed to do business in the State of California.

3.      Respondent Morgan Stanley Smith Barney, LLC ("MSSB" or "Respondent"), at all times material hereto was, and is a Delaware corporation, registered as a broker-dealer with the SEC and the State of California.  Claimant is informed and believes that on or about June 1, 2009, Citigroup contributed its Smith Barney Division ("Smith Barney") to Morgan Stanley Smith Barney Holdings, LLC ("MSSBH"), a joint venture owned by Citigroup and MS&Co.  At the same time, MS&Co. contributed its Global Wealth Management Group to MSSBH.  The joint venture owns MSSB.  MSSB's principal place of business is located at 1585 Broadway, New York, New York 10036.  MSSB is licensed to do business in California.  At all relevant times herein, MSSB was a signatory to the Protocol for Broker Recruiting ("Broker Protocol").

## FACTUAL ALLEGATIONS

### A.      Couch Is Employed By MS&Co.

4.      On or about August 30, 2007, Couch came to work as a financial advisor at MS&Co.  Prior to becoming employed by MS&Co., Couch enjoyed continuous employment in Bakersfield, California as a financial advisor with (i) Dean Witter Reynolds, Inc. ("Dean Witter") between 1988 and 1995; and (ii) Salmon Smith Barney, Inc. ("Smith Barney"), between 1995 and 2007.  During his tenure at Morgan Stanley, Couch, in his capacity as a financial advisor, primarily assisted clients with managed accounts (SMAs and UMAs), variable annuities, and generally encouraged clients that want to trade equities to enroll in the Morgan Stanley Choice Select program.  Couch also serviced the 401K plans of a few local businesses.

5.      Sometime in or about 2006, MS&Co. recruited Couch to join MS&Co. on the condition that Couch would facilitate the transfer of the business and accounts of his existing clients to MS&Co. and thereafter continue to service the business of the those clients at MS&Co.

/ / / /

**1**      6.     Couch resigned his position as a financial advisor with Smith Barney on or about

**2**  August 30, 2007. The same day, he commenced work at MS&Co. and began the process of

**3**  facilitating the transfer of the business and accounts of his Clients from Smith Barney to MS&Co.

**4**      7.     Days after Couch arrived at MS&Co., MS&Co. presented Couch with a series of

**5**  pre-printed agreements, adhesive in nature, that MS&Co. had prepared, the terms of which were

**6**  all non-negotiable, offered to Couch on a take-it-or-leave-it basis as a condition of his employment

**7**  (or a condition of his continuing employment). Those agreements are described in paragraphs 10

**8**  through 17 below.

**9**      8.     On or about September 4, 2007, Couch executed a "Financial Advisor Employment

**10**  Agreement" ("Employment Agreement"), a true and correct copy of which is annexed hereto as

**11**  Exhibit "A" and its terms incorporated herein by reference. The Employment Agreement purports

**12**  to define "Trade Secrets" of MS&Co. in paragraph 2.1, *et seq.* to include all of the oral and written

**13**  information (within Couch's custody and control immediately before he became employed at

**14**  MS&Co.) about the Couch Clients that transferred their accounts to MS&Co. ("Couch Client

**15**  Transferees"). Based on that definition of "Trade Secrets," pursuant to paragraph 3.2 of the

**16**  Employment Agreement, for a period of one year following Couch's termination as an MS&Co.

**17**  employee, Couch was prohibited from initiating any contact with any of clients he serviced while

**18**  at MS&Co.

**19**      9.     Paragraph 7 of the Employment Agreement expressly acknowledges that "statutory

**20**  employment claims" arising out of or relating to Couch's employment by MS&Co. are excluded

**21**  from arbitration. The phrase "statutory employment claims" is nowhere defined in the

**22**  Employment Agreement.

**23**      10.    On or about September 4, 2007, Couch executed a Bonus Agreement in favor of

**24**  MS&Co. ("Bonus 1"), a true and correct copy of which is annexed hereto as Exhibit "B" and its

**25**  terms incorporated herein by reference.

**26**      11.    Pursuant to the Bonus 1, MS&Co. agreed to pay Couch a specific bonus amount on

**27**  September 12, 2008, September 12, 2009, September 12, 2010, September 12, 2011,

**28**

1  September 12, 2012, September 12, 2013, September 12, 2014, September 12, 2015, and
2  September 12, 2016. The total amount of the bonus due Couch pursuant to the Bonus Agreement
3  was $639,128.00. Pursuant to paragraph 2 of Bonus 1, no unpaid bonus "shall be, or become, due
4  and payable hereunder unless (a) Employee is continuously in the employ of Morgan Stanley from
5  [September 4, 2007] to and including the date such bonus is due and payable according to the
6  scheduled contained in Paragraph 1 [of the Bonus Agreement] . . . ."

7      12.    In connection with its agreement to pay Couch Bonus 1, on or about August 30,
8  2007, MS&Co. delivered a check to Couch in the amount of $506,240.00 and then demanded that
9  Couch execute a Promissory Note in favor of MS&Co. ("Promissory Note 1"), a true and correct
10  copy of which is annexed hereto as Exhibit "C" and its terms incorporated herein by reference.
11  The amount of the loan to Couch reflected in Promissory Note 1, $506,240.00, is identical to the
12  amount of the "upfront bonus amount" identified in a document titled "2007 Recruit Cover Sheet,"
13  a true and correct copy of which is annexed hereto as Exhibit "D" and its terms incorporated
14  herein by reference.

15      13.    As reflected in Exhibits "B" and "C", each of the payments due Couch under
16  Bonus 1 was to be made to Couch within 12 days after Couch had paid MS&Co. the annual
17  installment due on August 30th under Promissory Note 1. Pursuant to Promissory Note 1,
18  MS&Co. had the right to declare Promissory Note 1 immediately due and payable if Couch were
19  terminated.

20      14.    In connection with his employment by MS&Co., Couch was offered an additional
21  bonus if he proved successful in transferring a high percentage of his Smith Barney client accounts
22  to MS&Co. after he joined the firm ("Bonus 1). Couch met the MS&Co. target and was awarded
23  Bonus 2, in the amount of $43,228.53, payable in installments over eight years. Bonus 2, like
24  Bonus 1, was subject to the same condition that Couch continuously be in the employ of MS&Co.
25  to and including on the date each installment of Bonus 2 is due and payable. But, no such
26  agreement appears in the personnel file that was recently transmitted to Couch by Morgan Stanley
27  ("Couch Personnel File").

28

**1**        15.    In connection with the Second Bonus, on or about December 11, 2008, MS&Co.

**2** delivered a check to Couch in the amount of $43,228.53 and then demanded that Couch execute a

**3** promissory note ("Promissory Note 2") in the amount of $43,228.53, a true and correct copy of

**4** which is annexed hereto as Exhibit "E," and its terms incorporated herein by reference.

**5** Promissory Note 2 called for eight payments by Couch to MS&Co on December 11, 2009,

**6** December 11, 2010, December 11, 2011, December 11, 2012, December 11, 2013, December 11,

**7** 2014, December 11, 2015, and December 11, 2016 each in the amount of $5,403.57. Pursuant to

**8** Promissory Note 2, MS&Co. had the right to declare Promissory Note 2 immediately due and

**9** payable if Couch were terminated. No copy of Promissory Note 2 appears to be in the Couch

**10** Personnel File.

**11**        **B.**    **MS&Co. Authorizes Couch's Activity As An Elected Public Official**

**12**        16.    When Couch agreed to become employed by MS&Co., he was a member of the

**13** Bakersfield City Council, a position to which he had been elected in 1998 and re-elected in 2002,

**14** 2006, and 2010.

**15**        17.    Months before he became employed by MS&Co., Couch had conversations with

**16** Rachell Fanucchi ("Fanucchi"), the person who became his immediate supervisor at MS&Co., in

**17** which he disclosed that he intended to seek re-election to the Bakersfield City Council and, if re-

**18** elected, to continue to serve as a member of the Bakersfield City Council. In addition, Couch

**19** disclosed to Fanucchi that he intended to run for the Kern County Board of Supervisors, probably

**20** in 2012. Couch provided Fanucchi with the information about his political activities because he

**21** wanted MS&Co. to be aware of and approve his plan before he accepted a job with MS&Co.. If

**22** MS&Co. had not approved Couch's existing and proposed activity as an elected public official he

**23** would not have agreed to accept MS&Co.'s offer of employment and would not have facilitated

**24** the transfer of his existing client accounts to MS&Co.

**25**        18.    Fanucchi followed up on Couch's request that she obtain approval of his plan to

**26** run for re-election as a member of the Bakersfield City Council and election to the Kern County

**27** Board of Supervisors and informed Couch that she did not think his plan would present a problem

**28**

1   for MS&Co. Thereafter, consistent with her prior representations, Fanucchi presented Couch with

2   an agreement re "Outside Activity Request" that was signed by Couch and Fanucchi, on behalf of

3   MS&Co., that approved Couch being a city council member and being a county supervisor subject

4   to certain conditions, all of which are set forth in the agreement ("MS&Co. Consent Re Public

5   Office"), a true and correct copy of which is annexed hereto as Exhibit "F" and its terms

6   incorporated herein by reference.

7       19.   The MS&Co. Consent Re Public Office was drafted by MS&Co personnel who

8   received input from outside counsel in connection with its preparation. Couch did not request any

9   changes to the MS&Co. Consent Re Public Office, and no changes were made before Couch

10   executed the agreement. Thereafter, MS&Co. never requested that Couch consent to any

11   modification to MS&Co. Consent Re Public Office. At all times relevant hereto, Couch has

12   abided by the terms of the MS&Co. Consent Re Public Office.

13       20.   If Fanucchi had not executed the MS&Co. Consent Re Public Office on behalf of

14   MS&Co., Couch would not have agreed to accept MS&Co.'s offer of employment and would not

15   have facilitated the transfer of his existing client accounts to MS&Co. Further, had MS&Co.

16   informed Claimant that its consent to the MS&Co. Consent Re Public Office was conditional or

17   could be reviewed and/or evoked at any time in the future, Couch would not have agreed to accept

18   MS&Co.'s offer of employment and would not have facilitated the transfer of his existing client

19   accounts to MS&Co.

20     **C.   Couch Is Terminated by Morgan Stanley After He Is Elected to the Kern**

21         **County Board of Supervisors**

22       21.   In late 2011 and early 2012, Couch had a series of conversations with Fanucchi

23   about his plan to run for the Kern County Board of Supervisors. During one such conversation in

24   or about January 2012, Fanucchi informed Couch that he needed to enter a request for this activity

25   on the Morgan Stanley OBI system ("OBI System"). According to Fanucchi, consistent with the

26   MS&Co. Consent re Public Office, Morgan Stanley's consent was "not a problem."

27   ////

28

22. On or about February 15-16, 2012, Couch entered a request to run for election to the Kern County Board of Supervisors on the OBI System ("Couch OBI").

23. According to the Morgan Stanley compliance manual, "[t]o request approval for an Outside Activity, employees must submit a request through the web-based Outside Business Interest (OBI) system. The request will be sent to the employee's Designated Manager for review. If the Designated Manager approves the request, Compliance will review and approve or deny the request. After a decision is made by Compliance, an approval or denial memorandum will be sent through OBI to the employee. If the Outside Activity is approved, the approval memorandum will contain any limitations or instructions concerning the activity. Previous disclosures will not need to be re-entered into OBI by SB Channel employees."

24. Claimant is informed and believes that all members of the Morgan Stanley management team that supervised Couch, including Fanucchi, had the ability to review and learn about the status of Couch OBI while it was pending. Claimant is further informed and believes that at Morgan Stanley, final action, approval or denial of an OBI, is the responsibility of a group in the Firm's New York office. Typically, final action on an OBI occurs within a week.

25. Dorothy Winick approved the Couch's OBI without conditions on February 15, 2012. Emmanuella Leveille-Robinson approved the Couch OBI without conditions on February 16, 2012. Based on the Couch OBI, MS&Co. was aware as early as February 16, 2012 that Couch would commence his position as Kern County Supervisor in January 2013. A true and correct copy of the Couch OBI approved by Dorothy Winick and Emmanuella Leveille-Robinson is annexed hereto as Exhibit "I".

26. After the Couch OBI was filed, while Couch was openly seeking election as Kern County Supervisor, actively campaigning and soliciting support for his candidacy, Morgan Stanley caused Couch to respond over a period of months to questions from various people at Morgan Stanley about hypothetical and remote potential conflicts that he might confront as a result of serving on the Kern County Board of Supervisors and working as a financial advisor at Morgan Stanley.

1    27.    At all times relevant herein, Couch was informed and lead to believe by Fanucchi
2    that, consistent with the MS&Co. Consent Re Public Office, Fanucchi had approved the Couch
3    OBI.

4    28.    On or about February 21, 2012, Jennifer Blake ("Blake"), then an attorney in
5    Morgan Stanley's legal department asked that Couch have "an authorized individual" from the
6    Kern County Board of Supervisors review and sign a "Conflict statement." a true and correct copy
7    of which is attached hereto as Exhibit "G." The letter, among other things, requests that the Kern
8    County Board of Supervisors provide the following assurances to Morgan Stanley: "[t]he [Kern
9    County Board of Supervisors] is aware of no law, rule, regulation or policy that would preclude
10   Morgan Stanley Smith Barney or its affiliates from doing business with the [Kern County Board
11   of Supervisors] its affiliates as a result of [David Couch's] position [as a member of the Kern
12   County Board of Supervisors]."

13   29.    On or about June 6, 2012, Couch was elected to the Kern County Board of
14   Supervisors. Approximately a month later, Couch was informed by counsel for the Kern County
15   Board of Supervisors that Kern County would not execute the letter.   Couch promptly
16   communicated this response to Fanucchi and perhaps to Blake from whom he received the form
17   letter.

18   30.    More than a month later, on July 26, 2012, a conference call was convened among
19   the Kern County General Counsel, Claimant, Blake and her supervisor regarding the Conflict
20   statement.   The result of the call "was for MSSB to provide an updated version of a Conflict
21   statement which both parties could agree to."   Subsequent to the July 26, 2012 call, no updated
22   version of a Conflict statement was provided to Kern County and no explanation was ever
23   provided by MSSB to Claimant why MSSB failed to live up to its agreement to provide an
24   updated version of the Conflict statement.

25   31.    At all relevant times between July 26, 2012 and December 20, 2012, Morgan
26   Stanley lead Couch to believe that the Couch OBI would be approved, consistent with the terms of
27   the MS&Co. Consent Re Public Office. At all relevant times between at least July 26, 2012 and

28

1  December 20, 2012, Morgan Stanley knew that Claimant was scheduled to be sworn in as a Kern
2  County Supervisor in early January 2013.

3      32.     Claimant is informed and believes that on or about November 14, 2012, *nine*
4  *months after the Couch OBI was filed*, Morgan Stanley senior management communicated about
5  the Couch OBI and MS&Co. Consent Re Public Office. In the course of those communications,
6  Morgan Stanley senior management was informed, *inter alia*, that Fanucchi and her immediate
7  supervisor, Jeff Branch ("Branch") did not want Claimant to be terminated, notwithstanding that
8  they understood that Couch's position was Kern County Supervisor was "full-time" because
9  Couch had a $300,000 promissory note. According to one member of Morgan Stanley senior
10  management (unbeknownst to Couch), if Claimant was terminated or resigned from Morgan
11  Stanley and did not pay the outstanding balances on Promissory Notes 1 and 2, there would be a
12  charge against the earnings of the branch for which Claimant for which Fanucchi was responsible.
13  Any such charge would necessarily adversely affect the profitability of the branch and adversely
14  affect at least Fanucchi's compensation, and, Claimant is informed and believed, in all likelihood,
15  Branch's compensation. Morgan Stanley senior management took no action in November 2012 in
16  response to the Couch OBI and MS&CO. Consent Re Public Office, including, but not limited to,
17  informing Couch about the competing issues and concerns discussed by Morgan Stanley senior
18  management regarding approval of Couch OBI notwithstanding the terms and conditions of
19  MS&CO. Consent Re Public Office.

20      33.     Claimant is informed and believes that Morgan Stanley senior management
21  communicated on December 19, 2012 and December 20, 2014, *ten months after the Couch OBI*
22  *was filed,* about the Couch OBI and MS&Co. Consent Re Public Office and discussed, among
23  other things, whether the Morgan Stanley client account distribution policies would apply if, as
24  Morgan Stanley senior management and Fanucchi and Branch agreed, Couch was terminated.

25      34.     Based on the consensus of Morgan Stanley senior management, including Bess
26  McKay, Michael Struckman and Rob Hampton, together with Branch and Fanucchi, on December
27  20, 2012, two business days before Christmas -- *more than six months after his election to the*
28

**1** *Kern County Board of Supervisors and ten months after the submission of the Couch OBI--*
**2** Couch participated in a telephone call with Fanucchi and Branch, during which: (i) Couch was
**3** told that the decision had been made that "the conflicts" (never identified or explained by Morgan
**4** Stanley during the call or at any other time) could not be handled to Morgan Stanley's satisfaction;
**5** and (ii) Couch was given an ultimatum that he had to decide by December 28, 2012 whether he
**6** wanted to be a Morgan Stanley financial advisor or a Kern County Supervisor. At the time of this
**7** call, Morgan Stanley was aware that Couch's mother was gravely ill in the hospital.

**8**       35.     It is the stated position of Morgan Stanley that the ultimatum delivered to Couch
**9** during the December 20, 2012 telephone call was "fair" and "reasonable" under the
**10** circumstances; and did not constitute a breach of the MS&Co. Consent Re Public Office.

**11**       36.     During the December 20, 2012 telephone call, Struckman was the person identified
**12** by Branch and/or Fanucchi as the person to whom Couch needed so speak about Morgan Stanley's
**13** ultimatum. In response, Couch scheduled a call with Struckman for the first available date after
**14** Claimant was informed Struckman returned to the office from vacation during the first week in
**15** January 2013. In addition, in advance of his scheduled call with Struckman, Couch transmitted a
**16** lengthy letter to Struckman, a true and correct copy of which is annexed hereto as Exhibit "H."
**17** During the call, Struckman falsely promised Couch that he would review the Couch situation and
**18** get back to Claimant. Struckman, however, never communicated with Couch after the call and no
**19** evidence has been produced in this action that Struckman took any action to fulfill his stated
**20** promise to Couch during their January 2013 telephone call.

**21**       37.     Instead, on the morning of January 16, 2013, Couch arrived at Morgan Stanley, as
**22** he had since he joined the firm in 2007, only to learn that the Morgan Stanley had changed the
**23** password on his computer so that he could not access any of the information on his computer,
**24** including, but not limited to, the information about his clients to which Couch would have been
**25** entitled to access under the Broker Protocol ("Protocol Information") had he been timely informed
**26** that Morgan Stanley would not allow him to serve as a Kern County Supervisor and given the

**27**
**28**

1 opportunity by Morgan Stanley to resign and transition his clients to a new firm that was also a
2 signatory to the Broker Protocol.

3 38. ***Six months later***, Couch, received from Morgan Stanley a copy of the Form U5
4 that the firm was required to file with FINRA which states the reason for Couch's termination.
5 The Termination Explanation provided by Morgan Stanley in the Form U5 that the firm caused to
6 be filed with FINRA ("Couch U5"), a true and correct copy of which is annexed hereto as Exhibit
7 "H" (with confirmation information redacted), is as follows: "SEPARATION FROM THE FIRM
8 IN LIGHT OF INDIVIDUAL'S COUNTY SUPERVISOR POSITION."

9 **D.    After Couch's Unlawful Termination, Morgan Stanley Diverts and**
10 **Misappropriates the Couch Clients**

11 39. Upon termination, Couch was immediately precluded from pursuing his lawful
12 profession because he was affiliated and/or registered with another broker-dealer. Moreover, on
13 account of the unlawful and outrageous circumstances of his termination, as described herein,
14 Couch did not have access to the Protocol Information and was successfully prevented by Morgan
15 Stanley from taking any action to solicit his clients and transfer the business he had developed
16 over a twenty-year career.

17 40. Paragraph 3 of the Employment Agreement titled "Unfair Competition," is a broad
18 prohibition that prevented Couch, immediately following the unlawful termination of his
19 employment from Morgan Stanley, from continuing his existing economic relationship with each
20 of the Couch Client Transferees. Paragraph 3 prohibited Couch from soliciting or attempting to
21 solicit, directly or indirectly, any of the clients he serviced while at Morgan Stanley, including the
22 Couch Client Transferees. Paragraph 3 of the Employment Agreement defines "solicit" as
23 follows: "initiation of any contact with customers for the purpose of conducting business with or
24 transferring accounts to any other person or firm that does business in any line of business in
25 which Morgan Stanley or any of its affiliates is engaged."

26 41. Couch is informed and believes that in connection with his unlawful termination
27 from Morgan Stanley, consistent with the Morgan Stanley client account distribution policies in
28

1 force and effect at the time of the Couch termination, the firm caused the business and accounts of
2 his Morgan Stanley clients to be diverted to other financial advisors employed by Morgan Stanley.
3 Couch is further informed and believes that consistent with Morgan Stanley's general practice in
4 connection with the distribution of the accounts of terminated financial advisors by means of a
5 ranking system, the accounts of the majority of Couch's client accounts were distributed to the
6 financial advisors at the Morgan Stanley Bakersfield office immediately following Couch's
7 unlawful termination.

8     42.     Couch is informed and believes that Morgan Stanley, as a result of its successful
9 misappropriation and diversion of the Couch Client Transferees, has been paid and will continue
10 to be paid substantial fees in connection with, among other things, the management of the business
11 and accounts of the Couch client accounts that it caused to be distributed to Morgan Stanley
12 financial advisors following Couch's unlawful termination.

13     **E.**     **Morgan Stanley Files A Claim In Arbitration to Recover On Promissory Notes**
14         **1 and 2**

15     43.     On or about September 19, 2013, Morgan Stanley and Morgan Stanley Smith
16 Barney FA Notes Holdings, LLC filed a Statement of Claim with FINRA seeking to recover
17 amounts allegedly due and owing by Couch on Promissory Notes 1 and 2 ("Morgan Stanley
18 Arbitration Claim"). That action was dismissed following Couch's payment to Morgan Stanley of
19 the amount it claimed was due under Promissory Notes 1 and 2. But for Morgan Stanley's
20 unlawful termination of Couch, as alleged more particularly herein, Morgan Stanley would not
21 have had any basis to assert that Couch was liable for any allegedly due on Promissory Notes 1
22 and 2.

23 / / / /
24 / / / /
25 / / / /
26 / / / /
27 / / / /

28

## FIRST CLAIM FOR RELIEF

## FOR INTENTIONAL INTERFERENCE WITH EXISTING AND PROSPECTIVE

## ECONOMIC RELATIONSHIPS

## (Against MORGAN STANLEY SMITH BARNEY, LLC and

## MORGAN STANLEY & CO., INCORPORATED)

44.     Claimant incorporates by this reference each and every allegation in paragraphs 1 through 43 as though fully set forth herein.

45.     As alleged more particularly herein, Morgan Stanley wrongfully acted in breach of the implied covenant of good faith and fair dealing in the MS&Co. Consent Re Public Office when it knowingly and intentionally failed to timely inform Couch that he would not be allowed to serve as a Kern County Supervisor and on or about January 16, 2013 and terminated Couch in, *inter alia*, breach of the covenant of good faith and fair dealing in the MS&Co. Consent Re Public Office .

46.     Morgan Stanley knowingly and intentionally failed to timely advise Couch that it would not allow Claimant serve as a Kern County Supervisor because Morgan Stanley knew and appreciated that had Couch been timely advised that Morgan Stanley would not allow to him to serve as a Kern County Supervisor, Claimant would have been in a position to resign from Morgan Stanley and, consistent with the Broker Protocol, affiliate with a new firm that was a signatory to the Broker Protocol so Couch would be free to transfer the clients and accounts that Claimant serviced during his tenure at Morgan Stanley.

47.     At the time of Couch's unlawful termination by Morgan Stanley, Claimant serviced client accounts that he had developed during his twenty plus year career as a financial advisor with whom Couch had an existing economic relationship, with the probability of future economic benefit to Couch.  Further, Morgan Stanley knew and appreciated that had Couch been timely advised that Morgan Stanley would not allow to him to serve as a Kern County Supervisor, Claimant would have been in a position to resign from Morgan Stanley and, consistent with the Broker Protocol, affiliate with a new firm that was a signatory to the Broker Protocol so Couch

1  would be free use Protocol Information to facilitate the transfer of at least 75% to 80% of the
2  accounts of clients that Claimant serviced during his tenure at Morgan Stanley.

3      48.    Given the facts and circumstances of Claimant's unlawful termination as alleged
4  more particularly herein and the prohibitions in Paragraph 3 of the Employment Agreement,
5  Morgan Stanley knew that upon Couch's termination, Couch's existing economic relationships
6  with his clients would not be continued and that Morgan Stanley could cause the Couch clients
7  accounts to be successfully diverted to financial advisors employed by Morgan Stanley.

8      49.    Paragraph 3 of the Employment Agreement is void and unenforceable in that it
9  violates California Business and Professions Code section 16600 that codifies California's general
10  policy with regard to non-compete agreements in the context of employment contracts. Except for
11  two statutory exceptions not relevant here, under section 16600, "every contract by which anyone
12  is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent
13  void."

14      50.    Morgan Stanley's use of an illegal non-compete agreement violates California
15  Business & Professions Code § 17200 ("UCL"). *See Khan v. K2 Pure Solutions, LP*, 981 F.
16  sup.2d 860 (N.D. Cal., 2013), order granting injunctive relief vacated on reconsideration, 2013
17  WL 6235572. By using illegal non-compete agreements, Morgan Stanley has engaged in a
18  practice that offends an established public policy of California.

19      51.    As a result of the unlawful termination of Couch by Morgan Stanley in breach of
20  the covenant of good faith and fair dealing in the MS&Co. Consent Re Public Office, as described
21  more particularly herein, the relationship between Couch and each of the Couch Client Transferees
22  has been disrupted.

23      52.    Morgan Stanley's conduct, as described herein, was intentional, willful, and
24  calculated to cause damage to Claimant.

25      53.    As a direct, proximate and foreseeable result of Morgan Stanley's knowing and
26  intentional breach of the implied covenant of good faith and fair dealing of the MS&Co. Consent
27  Re Public Office, Couch was and continues to suffer economic harm in an amount in excess of

28

1   $2 million dollars in that, *inter alia*, Morgan Stanley intentionally interfered with his existing and

2   prospective economic relationship with the clients he serviced during his tenure at Morgan Stanley

3        54.     As a direct, proximate and foreseeable result of Morgan Stanley's knowing and

4   intentional breach of the implied covenant of good faith and fair dealing of the MS&Co. Consent

5   Re Public Office, Morgan Stanley intentionally interfered with Couch's existing and prospective

6   economic relationship with the Couch Client Transferees and successfully misappropriated and

7   diverted the Couch Client Transferees to new Morgan Stanley financial advisors. Couch is

8   informed and believes that Morgan Stanley, as a result of its successful misappropriation and

9   diversion of the Couch Client Transferees, has been paid and will continue to be paid substantial

10   fees in connection with, among other things, the management of the business and accounts of the

11   Couch Client Transferees.

12        55.     In connection with its intentional interference with Couch's existing and

13   prospective economic relationships, an award of exemplary and punitive damages is appropriate

14   because Morgan Stanley is guilty of malice, in that, among other things, it knowingly and

15   intentionally engaged in despicable conduct, as alleged more particularly herein, that was intended

16   by Morgan Stanley to cause injury to Couch and which was carried on by Morgan Stanley with a

17   willful and conscious disregard of the implied covenant of good faith and fair dealing of the

18   MS&Co. Consent Re Public Office. Further, an award of exemplary and punitive damages is

19   appropriate because Morgan Stanley is guilty of oppression in that, among other things, it

20   knowingly engaged in despicable conduct, as alleged more particularly herein, that was intended

21   by Morgan Stanley to subject Couch to cruel and unjust hardship in conscious disregard of

22   Couch's protected rights under, among other things, the Labor Code. Couch is informed and

23   believes that officers, directors and/or managing agents of Morgan Stanley authorized and ratified

24   the conduct that was intended by Morgan Stanley to cause injury to Couch and which was carried

25   on by Morgan Stanley with a willful and conscious disregard of their duty to Couch consistent

26   with the implied covenant of good faith and fair dealing of the MS&Co. Consent Re Public Office.

27   / / / /

28

## SECOND CLAIM FOR RELIEF

## FOR NEGLIGENT INTERFERENCE WITH EXISTING AND PROSPECTIVE

## ECONOMIC RELATIONSHIPS

### (Against MORGAN STANLEY SMITH BARNEY, LLC and

### MORGAN STANLEY & CO., INCORPORATED)

56. Claimant incorporates by this reference each and every allegation in paragraphs 1 through 55 as though fully set forth herein.

57. As alleged more particularly herein, Morgan Stanley wrongfully acted in breach of the implied covenant of good faith and fair dealing in the MS&Co. Consent Re Public Office when it knowingly and intentionally failed to timely inform Couch that he would not be allowed to serve as a Kern County Supervisor and on or about January 16, 2013 and terminated Couch in violation of California Labor Code §§ 1101(a), 1102 and 98.6.

58. Morgan Stanley knowingly and intentionally failed to timely advise Couch that it would not allow Claimant serve as a Kern County Supervisor because Morgan Stanley knew and appreciated that had Couch been timely advised that Morgan Stanley would not allow to him to serve as a Kern County Supervisor, Claimant would have been in a position to resign from Morgan Stanley and, consistent with the Broker Protocol, affiliate with a new firm that was a signatory to the Broker Protocol so Couch would be free to transfer the clients and accounts that Claimant serviced during his tenure at Morgan Stanley.

59. At the time of Couch's unlawful termination by Morgan Stanley, Claimant serviced client accounts that he had developed during his twenty plus year career as a financial advisor with whom Couch had an existing economic relationship, with the probability of future economic benefit to Couch. Further, Morgan Stanley knew and appreciated that had Couch been timely advised that Morgan Stanley would not allow him to serve as a Kern County Supervisor, Claimant would have been in a position to resign from Morgan Stanley and, consistent with the Broker Protocol, affiliate with a new firm that was a signatory to the Broker Protocol so Couch would be

free use Protocol Information to facilitate the transfer of at least 75% to 80% of the accounts of clients that Claimant serviced during his tenure at Morgan Stanley.

60. Given the facts and circumstances of Claimant's unlawful termination as alleged more particularly herein and the prohibitions in Paragraph 3 of the Employment Agreement, Morgan Stanley knew that upon Couch's termination, Couch's existing economic relationships with his clients would not be continued and that Morgan Stanley could cause the Couch clients accounts to be successfully diverted to financial advisors employed by Morgan Stanley.

61. Paragraph 3 of the Employment Agreement is void and unenforceable in that it violates California Business and Professions Code section 16600 that codifies California's general policy with regard to non-compete agreements in the context of employment contracts. Except for two statutory exceptions not relevant here, under section 16600, "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

62. Morgan Stanley's use of an illegal non-compete agreement violates California Business & Professions Code § 17200 ("UCL"). *See Khan v. K2 Pure Solutions, LP*, 981 F. sup.2d 860 (N.D. Cal., 2013), order granting injunctive relief vacated on reconsideration, 2013 WL 6235572. By using illegal non-compete agreements, Morgan Stanley has engaged in a practice that offends an established public policy of California.

63. As a result of the unlawful termination of Couch by Morgan Stanley in knowing and intentional breach of the implied covenant of good faith and fair dealing, as described more particularly herein, the relationship between Couch and the client accounts he serviced while at Morgan Stanley has been disrupted.

64. Morgan Stanley's conduct, as described herein, was negligent and has caused and will continue to cause damage to Claimant.

65. As a direct, proximate and foreseeable result of Morgan Stanley's knowing and intentional breach of the implied covenant of good faith and fair dealing of the MS&Co. Consent Re Public Office, Couch was and continues to suffer economic harm in an amount in excess of

$2 million dollars in that, *inter alia*, Morgan Stanley interfered with his existing and prospective economic relationship with the clients he serviced during his tenure at Morgan Stanley.

THIRD CLAIM FOR RELIEF

FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

(Against MORGAN STANLEY SMITH BARNEY, LLC and

MORGAN STANLEY & CO., INCORPORATED)

66. Claimant incorporates by this reference each and every allegation in paragraphs 1 through 65 as though fully set forth herein.

67. In connection with the MS&Co. Consent Re Public Office between Morgan Stanley and Claimant, there exists an implied covenant of good faith and fair dealing that neither party will do anything to impair the other party's rights to receive the benefits under the contract.

68. It is Morgan Stanley's position that it did not act in breach of the MS&Co. Consent Re Public Office when it terminated Claimant on or about January 16r, 2013. According to Morgan Stanley, Claimant was an at will employee who could be terminated with or without cause.

69. Morgan Stanley acted in breach of the implied covenant of good faith and fair dealing in the MS&Co. Consent Re Public Office when Morgan Stanley failed to timely advise Couch that it would not allow him to serve as a Kern County Supervisor, so that Morgan Stanley would be able to successfully divert and misappropriate the business and accounts of clients that Couch serviced during his tenure at Morgan Stanley. Morgan Stanley failed to timely advise Couch that it would not allow Claimant serve as a Kern County Supervisor because Morgan Stanley knew and appreciated that had Couch been timely advised that Morgan Stanley would not allow to him to serve as a Kern County Supervisor, Claimant would have been in a position to resign from Morgan Stanley and, consistent with the Broker Protocol, affiliate with a new firm that was a signatory to the Broker Protocol so Couch would be free use Protocol Information to facilitate the transfer of at least 75% to 80% of the accounts of clients that Claimant serviced during his tenure at Morgan Stanley.

1       70.     As a proximate result of Morgan Stanley's breach of the implied covenant of good

2 faith and fair dealing, Claimant has suffered damages in an amount in excess of $2 million dollars.

3 FOURTH CLAIM FOR RELIEF

4 FOR FRAUD AND DECEIT

5 (Against MORGAN STANLEY SMITH BARNEY, LLC and

6 MORGAN STANLEY & CO., INCORPORATED)

7       71.     Claimant incorporates by this reference each and every allegation in paragraphs 1

8 through 70 as though fully set forth herein.

9       72.     Claimant was induced to join Morgan Stanley based on the material repeated

10 representations of Fanucchi, prior to his joining Morgan Stanley in 2007, that he had received

11 Morgan Stanley's approval to run for the position of Kern County Supervisor and serve in that

12 capacity, if elected. Those representations, when made, were materially false and misleading in

13 that Fanucchi concealed material information from Couch which Morgan Stanley had a duty to

14 disclose.

15       73.     Prior to Fanucchi's execution of the MS&Co. Consent Re Public Office on behalf

16 of Morgan Stanley, Fanucchi was informed that Morgan Stanley's approval of the terms of the

17 MS&Co. Consent Re Public Office was conditional in that, *inter alia*, it was the position of

18 Morgan Stanley that the terms of the MS&Co. Consent Re Public Office could be reviewed and

19 unilaterally modified or revoked by Morgan Stanley, without any further consideration paid by

20 Morgan Stanley to Couch, so that Couch would not be authorized by Morgan Stanley to serve as a

21 Kern County Supervisor and be entitled to the economic and other benefits of that elected position

22 simultaneous with Claimant continuing his employment as a Morgan Stanley financial advisor.

23       74.     Fanucchi had exclusive knowledge of these material facts that were not known to

24 Claimant and that Fanucchi intentionally concealed from Claimant so she could close the deal she

25 was then aggressively pursuing on behalf of Morgan Stanley with the Buena Vista Group of which

26 Claimant was a member in 2007.

27 / / / /

28

19

75. Morgan Stanley had a duty to disclose these material facts in connection with its negotiation and execution of the MS&Co. Consent Re Public Office.

76. In connection with his decision to join Morgan Stanley in 2007, Claimant reasonably relied on Fanucchi's representations that Morgan Stanley had approved, in writing, Claimant's request that while a Morgan Stanley financial advisor, Morgan Stanley agreed that Claimant could run for the position of Kern County Supervisor and serve in that capacity, if elected, while continuing to be employed as a Morgan Stanley financial advisor. Claimant, at all relevant times, believed that Morgan Stanley's approval was unconditional.

77. As a proximate result of Morgan Stanley's fraud and deceit, Claimant has suffered damages in an amount in excess of $2 million dollars.

**WHEREFORE**, Claimant prays for Judgment against Morgan Stanley as follows:

1. First, Second, Third and Fourth Claims for Relief: Compensatory and exemplary and punitive damages and/or disgorgement to be awarded to Couch according to proof at trial;

2. For costs of suit incurred herein, including reasonable attorneys' fees, costs and expenses;

3. For prejudgment interest at the legal rate; and

4. For such other and further relief as the Arbitrators may deem just and proper.

Dated: June 2, 2015          KAPLAN ZEENA LLP


By: _____

DEBORAH KLAR
Attorneys for Claimant
DAVID COUCH